(47 App. Div. 331.)

STERN v. LADEW et al.

(Supreme Court, Appellate Division, Second Department. January 9, 1900.)

1. ACCOUNT STATED—OPENING—CORRECTING.

Defendant arranged with plaintiff to purchase and pay him the highest market price for all hides he should kill and buy, and give him an extra price for hides prepared in a certain way. Both parties were extensive dealers in hides, defendant purchasing in the market, though in a smaller way, the same as plaintiff, at the market price. Defendant rendered plaintiff weekly statements of the amount of hides, and the price at which they were taken, which plaintiff accepted each week, with a check for the amount. *Held*, that since the plaintiff was possessed of the same knowledge and the same means of informing himself of the prices which defendants by their statements asserted to be the highest market price, and might by reasonable diligence have informed himself, he could not rely on the belief that the defendant was paying him the highest market price without examining the weekly statements, and afterwards, on the ground of mutual mistake, claim the statements were incorrect in not allowing him the highest market price.

2. SALES—MARKET VALUE.

Where defendant agreed to pay plaintiff the "highest market price" for hides, and in a subsequent arrangement agreed to pay "as much as anybody else would pay," the obligation resting upon plaintiff to ascertain for himself whether he was receiving the highest price, in either case, was the same; as the later arrangement was but another form of stating the market value.

Appeal from judgment on report of referee.

Action by Joseph Stern against Edward R. Ladew and another. Judgment for plaintiff for partial relief, and cross appeals by both plaintiff and defendants. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, HATCH, and WOODWARD, JJ.

Jacob Steinhardt, for plaintiff.
Samuel Untermyer (Louis Marshall, on the brief), for defendants.

HATCH, J. In the view which we take of this case, it is not necessary that we examine in detail the complicated state of facts which surrounds the dealings between the parties to the action. A brief review of the general features of the case, and of that particular part of the testimony which controls our decision, is all that is essential to a disposition of the case, under the rules of law which we deem applicable thereto.

The plaintiff was a wholesale butcher and slaughterer of cattle, had been since 1858, and, during the years covering the transactions which were the subject of investigation upon the trial, had on the average killed about 1,500 head of cattle weekly, being one of the four largest slaughterers and dealers in hides in the city. He was also a purchaser of fresh hides from other killers in the city, the extent of such purchases running about 150 hides per week. The cattle which he slaughtered were divided into three classes, known to the trade as "natives," "Texans," and "Colorados." The natives, for the most part, were cattle whose hides were free of brands. The Texans and Colorados were branded upon the sides and the buttocks, and were known to the trade as "sides and butts." In price the natives were the highest, and the Colorados the lowest. The determining factor regulating the price, aside from the quality of the hides themselves, was the presence or absence of brands; the side brand being more damaging than the butt brand. The hides were also subject to other imperfections which detracted from their value, occasioned by grubs which were present in the hides during certain seasons of the year, and also by injuries, usually in the form of cuts made by the butcher in removing the hides. As the hides were removed, they were salted, and placed in what were termed "beds," about 800 being placed in a bed. A "shingled" bed was made by lapping, in manner similar to shingles laid upon a roof, so as to make one side lower than the other. This was for the purpose of removing the moisture from the hides. The pressure excluded the blood and water, and decreased the weight of the hides. Another method was to lay them flat in the bed, in which condition they retained more moisture, and consequently weighed more. The hides remained in the beds from 10 to 14 days, when they were removed, and sold in the market.

The defendants were dealers in hides which they purchased from the various killers. The firm was originally composed of Daniel B. Fayerweather, Edward R. Ladew, and Harvey S. Ladew. In 1889, Harvey S. died, and Joseph H. succeeded as a member of the firm. In 1890, Fayerweather died, and the business had been conducted by the defendants since that time. There was a market price for hides in the city of New York during all this time, which was made up by the number of hides furnished to the market in New York and Chicago, and was influenced by the number and character of hides offered for sale. There was quite a large number of brokers and dealers in hides in New York. The market price was arrived

at to some extent by communication between those who dealt in the article, and by reports of sales and prices quoted. No regular public market quotations were introduced in evidence, but proof of such reports was given by at least one broker, and the use made thereof. The published reports offered in evidence were not received. The defendants were much the larger purchasers in the market, taking from 75 to 80 per cent. of the output. Their statement of the market price was determined in the manner above stated.

The plaintiff's first cause of action is based upon a contract which is alleged to have been entered into between the plaintiff and defendants prior to June 26, 1891, whereby plaintiff was to sell to defendants the hides of the cattle killed by him in his business, to salt them shingled, and dress in a careful manner, the defendants to remove the same from plaintiff's premises, to render to the plaintiff on the last day of each week a statement of the hides so purchased and removed, and promptly to pay for such hides the highest market price, together with an additional sum of one cent a pound for shingled hides, and an additional sum of ten cents per hide for those carefully dressed; that subsequently, and on June 26th, the same was modified by reducing the additional sum which the defendants were to pay for salting and shingling from one cent to three-quarters of a cent per pound; that the defendants continued to take plaintiff's output of hides from the date of the agreement until about the 27th day of December, 1891; that during this period weekly statements of accounts and payments were made by the defendants, and received and accepted by the plaintiff; that on or about December 27, 1891, the agreement was further modified by providing that the hides were to be salted flat by the plaintiff instead of being shingled, and the additional sum of three-quarters of a cent per pound for shingling, and ten cents per hide for careful dressing, was discontinued; that the hides so salted flat were removed in the same manner by the defendants as prior thereto, and weekly statements and payments made as theretofore; that since the rendition of such weekly statements the plaintiff discovered them to be mistaken or false and fraudulent in the items thereof, of which fact he was ignorant at the time they were received; and that by reason thereof the plaintiff has not received for his hides as much as he should have received by something over $15,000. Plaintiff's second cause of action arose out of the same state of facts as the first, except that it embraced but one weekly statement, that of June 4, 1892, the correctness of which plaintiff denied, and notified the defendants that he accepted the check accompanying the statement as payment upon account, and not in discharge of defendants' indebtedness to him. The complaint was amended upon the trial, but not in such manner as to change the facts as averred therein, except as to the amount which the plaintiff claimed to be entitled to recover, which exceeded the sum originally demanded.

After a trial, the referee found upon the first cause of action stated in the complaint, that the weekly statements were incorrect during the months of October, November, and December, 1891, and that·the plaintiff was entitled to have the same opened and cor-

rected as prayed for in his complaint, on the ground of a mutual mistake of the parties; and, as to the second cause of action, he found that the complaint should be dismissed. The decision proceeded upon the ground that the defendants, in rendering to the plaintiff the weekly statements of account under the first modification of the agreement as heretofore stated, intended to pay the plaintiff the full market value of his hides; that the plaintiff trusted the defendants, and believed that their weekly statements were true; that, as matter of fact, the amount so paid, which was covered by the weekly statements from October 3 to December 26, 1891, both inclusive, was less than the actual market value of such hides by the sum of $9,101.77; that the plaintiff was not guilty of negligence or laches, and that the defendants were not guilty of any fraud; that the plaintiff was not chargeable with any act or omission which estopped him from asking that the mutual mistake be corrected, so that he might receive the fair value of the hides delivered; that the hides delivered after January 1, 1892, were so delivered under a different agreement, by which the defendants were to pay the plaintiff for hides salted flat as much as anybody else would pay; that there was no proof of the breach of this agreement, as the weekly statements were rendered by the defendants, and weekly payments made for the hides delivered, and that each weekly transaction was independent of every other; that, by accepting and appropriating without objection the payment for each weekly delivery, the plaintiff had concluded himself from disputing its correctness; that there was neither proof of fraud on the part of the defendants, nor any proof of mutual mistake; and that it was the business of the plaintiff to find out whether any person would pay more for the hides than the defendants offered or proposed to pay. The basis of the referee's conclusion is therefore clearly and sharply defined. His first conclusion proceeds upon the ground that, as the defendants were to pay the highest market price, and an additional bonus for shingling, etc., the plaintiff had the right to rely thereon, without making any examination of the statements, resting in the belief that the defendants were paying him the highest market price for his hides, and that no duty was imposed upon the plaintiff to make any examination whatever; that the modified agreement, under which the defendants were to pay for his hides salted flat as much as anybody else would pay, imposed upon the plaintiff the duty of informing himself whether in fact anybody else was paying more than the defendants tendered as the price under such arrangement. The defendants appeal from that part of the judgment which directs a recovery against them. The plaintiff appeals from so much of the judgment as dismisses his complaint upon the second cause of action.

In the disposition of this case, therefore, we are brought to consider whether the arrangement which was made authorized the plaintiff to rely solely and entirely upon the statements of the defendants that they were paying him the highest market price for his hides, and, if so, whether any different rule could be applied to the modification of the agreement. In order to dispose of these

questions, it becomes essential to examine the plaintiff's testimony upon the subject. There was at no time any written contract between these parties, and the terms of the agreement rest solely in the statements made by the plaintiff. The arrangement itself was made about 1878 with Mr. Fayerweather. The plaintiff states it in these words: "Mr. Fayerweather said to me, 'If you shingle the hides for me,—all your hides which you kill and buy,—I will give you the highest market price, and one cent a pound above the market price, for your hides.'" And further he adds: "The extra cent a pound was for salting and shingling these hides, and there was also ten cents extra for every hide which is taken off clear of cuts." Fayerweather was also to send a man to look after the hides, and take them away whenever they were ready. It appears, therefore, that the arrangement was made with a man deceased at the time of the trial; and, had objection been taken to this testimony, it would properly have been excluded, under section 829 of the Code of Civil Procedure. Green v. Edick, 56 N. Y. 613; Clift v. Moses, 112 N. Y. 426, 20 N. E. 392. But, it having come in without objection, force and effect may be given to it, subject to such care and scrutiny as the conditions require, and by no means extending it in operation. It did not constitute an agreement between the parties, and it imposed no liability upon either. Under its terms, the predecessors of the defendants were not required to take any hides, nor did it bind the plaintiff to deliver any. It was a mere option, under which neither party assumed liability. Railway Co. v. Dane, 43 N. Y. 240; Barrow Steamship Co. v. Mexican Cent. R. Co., 134 N. Y. 15, 31 N. E. 261, 17 L. R. A. 359. If in terms it had contained the elements of a contract, it would have been void, as being in contravention of the statute of frauds. It did not rise to the dignity of a contract. It was a mere business arrangement, under which one proposed to buy, and the other to sell, under certain conditions. Undoubtedly, when the arrangement became executed, the measure of obligation of the executed arrangement was governed by its terms. The measure of obligation which rested on both parties is to be determined by the character of the arrangement, the acts done under it, and the relative positions of the parties. It is entirely clear that the plaintiff, who had then been in the business of slaughtering cattle and selling hides in the city of New York for 20 years, and conducted the same successfully, having a weekly output of 1,500 hides, must be presumed to have known the conditions under which the sale of hides was carried on in New York, and to have had the means of informing himself of the market price of such hides, whether they were sold according to a particular classification, or whether they were averaged in price as a mixed lot in the beds. Such a condition creates the conclusive presumption that, as he had been continuously engaged in the sale of hides for 20 years, he had knowledge of their value. It may be true that, the defendants and their predecessors being extensive dealers in hides in New York, their purchases to a very great extent governed and controlled the market price; but it is equally true that the plaintiff during the same period of time had

an output of nearly 1,500 hides weekly, which he must have sold upon the market, and therefore he must have been presumed equally to know the conditions which fixed the market price, and the market price itself, and possessed the means at any and all times of thus informing himself. It is noticeable, also, that this arrangement provides, not only for the output of the hides removed from the animals which the plaintiff slaughtered, but also embraced hides which the plaintiff might purchase in the market. His testimony upon the subject of the purchase of hides in the market is pertinent and important, and conclusive upon his knowledge. It appears that he purchased from a number of dealers, some in Albany, and quite largely from a Brooklyn concern, his purchases averaging 150 hides a week. Upon this subject he states:

"The hides that I bought from the Brooklyn concern I salted and cured myself. * * * I always had paid to the Brooklyn concern the highest market price that fresh hides were bringing in the market. * * * The difference between the price for fresh hides and the price for salted hides was from one and a half cents to two cents a pound. I paid for the fresh hides that I got, weekly. Q. Did you fix the price? A. I paid them the highest market price. They left it to me. They were satisfied as long as I paid them the highest market price. * * * There were plenty of other people in the market, and I was guided by what everybody else paid. I kept myself posted upon the price of fresh hides right along. I knew that the price I was paying for them was the highest market price. Q. How did you keep yourself posted as to the price of the fresh hides? A. For instance, Messrs. Schwarzchild & Sulzberger bought hides maybe of a next-door neighbor, which kills next door to a man I get my hides from. Schwarzchild & Sulsberger pay seven cents or six and a half cents, for argument's sake. I had to pay the same price. Messrs. May & Levy buy hides, and so Mr. Eastman was buying hides, and every butcher will find out if Mr. Eastman pays a quarter more than I do. I hear it two days afterwards. I have to pay always the highest market price for what I get."

This testimony conclusively establishes, if the presumption did not already exist, that during the period of time when the plaintiff was selling his hides to the defendants and their predecessors he had actual knowledge of the market price of hides, and kept himself posted upon that subject. The means which he adopted to inform himself of the market price were precisely the same means which all other dealers in hides, including the defendants, resorted to for the same purpose during the same period. The plaintiff knew the price of fresh hides, and knew the difference between such price and the price of salted or cured hides, whether the same was measured by classification or averaged on bed lots. Indeed, as between the former and the latter, knowledge of one provided knowledge of the other. Knowledge of classification which determined the price must, of necessity, have determined the average for mixed lots. So that, however the market price of the hides was made up, it is clear that the plaintiff had the same means of informing himself of the price, knew how to avail himself of it, had so availed himself in making his purchases, and it was all backed by experience of very large dealings for over 20 years. It is no answer to say that the hides which the plaintiff purchased were in many instances incumbered with the tail, the head, and the horns. The testimony disclosed that all these parts of the animal have a market value, and

were sold by the plaintiff in the market. So that whether he bought other parts with the hide, or whether he bought the hides clear and distinct, his knowledge of their value was not impaired, and the result was as accurate in one case as it could possibly be in the other. Indeed, it would not have changed such condition had he bought the whole animal, as he would then have known what the meat was worth, what the head and the horns were worth, and what the tail was worth, as they all had a more or less well-defined market value. Nor is plaintiff's knowledge in this respect to be minimized because the dealings were small. This was a relative condition. There were 150 hides a week, and they amounted to a considerable sum. The dealings were small as compared with the large output of the plaintiff. They were also sufficiently large to conclusively establish that to deal in them successfully required as accurate knowledge of market prices as did the dealing with the 1,500 head of cattle which the plaintiff slaughtered each week; and, as we have before observed, the method which he adopted to arrive at the market price of these hides was the same method to which resort was had in order to establish the market price of the whole. So that information which enabled him to deal with one clearly enabled him to deal with the other.

We must therefore regard the plaintiff, for all the purposes of determining this controversy, as possessed of knowledge substantially equal to that possessed by the defendants. Under such circumstances, and under the arrangement as testified to by him, by which the dealing was carried on, the plaintiff could not shelter himself behind a conclusive reliance upon defendants' statements of the market price, and not make use of the equal knowledge which he possessed to determine whether the returned valuation of his hides by the defendants, as given in the weekly statements, represented the highest market price.

Disposition has been made of this case upon the theory that there has been a mutual mistake of parties. We think that upon the testimony it is too clear for argument that the defendants were not mistaken in anything that they did in respect to this market price. It is not disputed that they made the inquiries, or that, based upon such inquiries, they fixed the market value of the plaintiff's hides. It is equally true, as we have seen, that, had the plaintiff made examination of the weekly statements, if there was any discrepancy between the highest market price and the price set out in the statements he could immediately have discovered it. It is true that an account stated may be impeached, and the account opened and corrected, for errors therein arising either from mistake or fraud. Paper Co. v. Moore, 104 N. Y. 680, 10 N. E. 861. In the present case the referee excluded, and we think correctly, any element of fraud in the transaction. It therefore rests solely upon mistake, and such mistake must have been mutual. The mistake of one is not sufficient. Welles v. Yates, 44 N. Y. 525. It is equally well settled that the burden of establishing such mutual mistake rests upon the party who asserts it, and it must be made out by clear and satisfactory proof. Southard v. Curley, 134 N. Y. 148, 31 N. E. 330,

16 L. R. A. 561. It is also a familiar rule that the party who asserts the existence of a mistake must show that he has not been lacking in any care or vigilance which the circumstances demanded of him. Nor is it required that both parties shall stand upon the same footing in all respects, as to knowledge and information, in order to relieve the party of vigilant care for his own interests. If they stand upon a footing of substantial equality, then, in the absence of fraud, each is bound by the terms of the contract and the fulfillment of its obligations. Stettheimer v. Killip, 75 N. Y. 283. Applying these rules to this case, we think it clearly appeared that the plaintiff was possessed of the same information, or the means of obtaining it, of which the defendants were possessed, and, as the latter paid what they deemed to be the highest price, they made no mistake in that regard. As the plaintiff was possessed of the means of informing himself of the prices which the defendants by their acts asserted were the highest market prices, and might by the exercise of reasonable vigilance and care have informed himself, a case was not made which authorized the court to find that there was a mutual mistake of the parties. The contract in terms provides that a settlement of the account shall be made at the expiration of each week. The statements which were rendered by the defendants to the plaintiff constituted an account stated of the weekly transactions between the parties; and as the parties dealt in respect to the subject-matter, both as to kind and quality of hides and market price, upon a basis of substantial equality, such accounts became accounts stated, and the acceptance and retention of the check made a completed transaction, and bound the plaintiff in accordance with its terms, even though in fact the market price as stated was less than the sum agreed upon. Nassoiy v. Tomlinson, 148 N. Y. 326, 42 N. E. 715; Logan v. Davidson, 18 App. Div. 353, 45 N. Y. Supp. 961. In this regard we are unable to concur with the views of the learned referee in disposing of this case. He seems to have considered that payment of the "highest market price," stated in the first arrangement, and "as much as anybody else would pay" for the hides, as stated in the modified contract, created a condition for the application of distinct and antagonistic principles. We are not able to see any distinction between the obligation imposed on the plaintiff to give some care to the subject of whether he was receiving the highest price paid by anybody else and whether he was receiving the highest market price. In order to determine the latter, substantially the same steps would be required as to inform himself of the former. Indeed, the condition of the modified agreement was but another form of stating the market price. It would be quite doubtful, if the plaintiff sought to enforce the latter contract upon the basis of demanding what was paid to another seller under exceptional circumstances, whether he could do so, because the fair and reasonable intendment of such language would be that he should receive as much as anybody else for a similar commodity under similar circumstances, and this would be only another way of stating that he was to receive the highest market price. He could no more sit passively, and make no inquiry, in the one case than he could

in the other. The market price of the article was equally to be determined by inquiry and from actual transactions. What was the highest sum paid to any one else would be discovered by inquiry and actual transactions. We should readily agree with the claim of the plaintiff that if he was entitled to recover under his first cause of action he was equally entitled to recover on his second, as we believe that no sound distinction can be drawn between the phraseology used upon each of the two occasions. It is said that the plaintiff was excused from examining these reports, for the reason that he was absent from the city during the period for which the recovery was had. His testimony is not entirely clear as to the length of time he was absent. He states that his wife died on July 20th, and follows that by the statement that he was absent from his business about three months. If this absence dated from the 20th of July, then he would have returned by the 20th of October. But assuming that he was absent from his business during the whole period between October and December 26, 1891, we are of opinion that the result would not be changed. During his absence his business was under the management of his brother-in-law. It was continued without interruption, and, so far as concerned persons dealing therewith, no information was given to them that in all branches the business was not being conducted in precisely the same manner as when the plaintiff was present. He testified that he was the only man who had to do with the purchase and price of hides, and that no one else was competent or charged with the duty of making examination of the statements in that connection. It is to be borne in mind, however, that this contract or arrangement, whatever it be called, was terminable at the will of either party. When the defendants made their weekly statements, accompanied by checks, as they then determined the price they were willing to pay, the plaintiff became required to either accept or reject it. Non constat, had the plaintiff at any time objected to these statements and payments, the defendants would have exercised their right to terminate the contract, and refused to pay more. It did not lie with the plaintiff to abandon his business on account of any conditions, accept these weekly statements, and receive pay thereunder, and then avoid their force and effect by the claim that he did not examine them, and that he furnished no person who was competent to do so. The obligation assumed by this arrangement was a mutual obligation. The dealings were to be settled each week. Either party, if dissatisfied for any cause, at the expiration of that period could terminate all relations. Under such circumstances, we do not think the plaintiff could create a condition where he could remain passive, exercising neither vigilance nor care, accept money in payment for hides delivered, and then, long afterwards, have the account opened and surcharged in a large amount, as has been done in this case. Had objection been made, the defendants might well have insisted that they would pay no more, and bring the arrangement to an end; and we think it would be an unjust rule to permit the party to accept without objection, and thereafter charge the defendants with a liability which they would never have been willing to assume. We think that nothing

short of actual fraud could have the effect of avoiding what was an open transaction, wherein the defects, if any, could have been discovered by the exercise of care. This care the plaintiff was bound to exercise, and could not relieve himself from such obligation either by accepting the statements and payments without examination, or by leaving his business in such shape that the statements and payments would be accepted, and then be heard to say that no one was authorized to make an examination or pass upon the correctness of the statements and the payments under them. For these reasons, we are of opinion that the judgment may not be sustained.

The judgment should be reversed, and a new trial granted, costs to abide the event. All concur.